## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **KRIS CHAPTER JACKSON,** | |
| **Plaintiff**, | **Case No. 23-2403-DDC-TJJ** |
| **v.** | |
| **SANTANDER CONSUMER USA INC., et al.,** | |
| **Defendants**. | |

## MEMORANDUM AND ORDER

It all began on a Tuesday.  Plaintiff, Kris Chapter Jackson, visited defendant, Aristocrat

Motors – Mercedes Benz, to purchase a used Porsche.  This was on December 4, 2018.

Numerous issues with the purchase and financing of that Porsche allegedly ensued—forgeries on

the title, false mileage statements, an incomplete retail installment contract, forgery of plaintiff's

signature, and receipt of a different Porsche than the one plaintiff chose.  Later, in August 2021,

plaintiff stopped paying on the Porsche loan.  Debt collection attempts followed.  Things

unraveled quickly and plaintiff filed a lawsuit against Aristocrat Motors, other involved entities,

and individual employees.  Plaintiff first filed suit on January 10, 2022, in the District Court of

Johnson County, Kansas.  Just two days later, plaintiff filed this suit in federal court.[1]  Plaintiff

premised her claims in both suits on the same underlying vehicle purchase and financing dispute,

along with its subsequent unraveling.

---

[1] Plaintiff filed the present action in the United States District Court for the Western District of Missouri.  *See* Doc. 1.  The Western District of Missouri transferred the case for improper venue to the District of Kansas in September 2023.  Doc. 85 at 6; Doc. 86.

Defendants jointly move to dismiss or stay this case under the *Colorado River* doctrine or, alternatively, to dismiss it based on impermissible claim-splitting. Doc. 120 at 1–2. *Colorado River* permits a court to stay or dismiss a case when a parallel case remains pending in state court—in the name of "wise judicial administration," conserving "judicial resources," and comprehensively disposing of litigation. *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) (quotation cleaned up). The court finds that the state court case here is a parallel case under *Colorado River* and its progeny. And the court concludes that the *Colorado River* factors favor staying the present case, pending the outcome of the parallel state case. To promote judicial economy and preserve judicial resources, the court thus stays and administratively closes the present case. The court explains its ruling, below, starting with the background facts.[2]

## I.    Background

The court recites the following background based on the allegations in plaintiff's Second Amended Complaint (Doc. 46). Plaintiff alleges as follows:

### *Previous Ownership and Transfer of the Porsche*

Ronald Meyer purchased a new Porsche Cayenne in April 2015. Doc. 46 at 6–7 (2nd Am. Compl. ¶ 21). Ronald Meyer sold the vehicle back to the dealership, Aristocrat Motors, in October 2017—without completing the title paperwork. *Id.* at 7 (2nd Am. Compl. ¶ 22). As

---

[2]    The court is mindful that plaintiff recently filed a Petition for Writ of Mandamus with the Tenth Circuit. *See* Doc. 289. Generally, a Petition for Writ of Mandamus doesn't serve as a notice of appeal. *See Jaiyeola v. Garmin Int'l, Inc.*, No. 20-CV-02068-HLT-JPO, 2022 WL 1218642 (10th Cir. Apr. 26, 2022). But as *Jaiyeola* recognizes, courts can treat a Petition as a notice of appeal "when necessary to preserve the right to appeal an appealable order[.]" *Id.* at *4. That exception doesn't apply here, however, because, as in *Jaiyeola*, nothing in this plaintiff's Petition for Writ of Mandamus suggests she's seeking to appeal an Order. To the contrary, her Petition asks the Circuit to direct our court to rule on motions she contends are pending. The court thus concludes that plaintiff's filing her Petition does not divest the court of its jurisdiction.

such, Aristocrat Motors failed to secure ownership of the vehicle.  *Id.* (2nd Am. Compl. ¶ 23).

To resolve this issue, Aristocrat Motors allegedly forged Ronald Meyer's signature on the title

paperwork and used a fictious individual, Donald G. Meyer, on the documents.  *Id.* at 7–8 (2nd

Am. Compl. ¶ 24).  The fictitious individual made false statements about the vehicle's odometer

reading.  *Id.* at 10 (2nd Am. Compl. ¶ 31).  Ronald Meyer failed to transfer ownership of the

Porsche to Aristocrat Motors, and thus the dealership didn't own the car so it couldn't sell the car

to plaintiff.  *Id.* at 24–25 (2nd Am. Compl. ¶ 80).

### *Plaintiff's Purchase of the Porsche*

Plaintiff visited the dealership on December 4, 2018, to purchase a black Porsche

Cayenne.  *Id.* at 14 (2nd Am. Compl. ¶ 47).  Defendant Stephanie Turner, finance manager of

Aristocrat Motors, rushed plaintiff and her co-borrower through the credit application process,

filling out some of the application herself.  *Id.* at 14–15 (2nd Am. Compl. ¶ 50).  Ms. Turner left

portions of the application incomplete.  *Id.* at 15–16 (2nd Am. Compl. ¶ 51).  And Ms. Turner

never requested qualifying documents to support plaintiff's loan.  *Id.* at 16 (2nd Am. Compl.

¶ 54).  Despite defendants never requesting income verification and never running plaintiff's

credit history, plaintiff and her co-borrower received a loan with a 24.90% interest rate.  *Id.* (2nd

Am. Compl. ¶¶ 52–54).

Allegedly, the dealership never presented plaintiff with page two of the retail installment

contract and, thus, the contract wasn't executed fully.  *Id.* at 19–20 (2nd Am. Compl. ¶ 66).

Later, when plaintiff received a response to her consumer financial complaint from one of the

financing entities involved—defendant Chrysler Capital—plaintiff noticed a forgery of her

signature on the contract's page two.  *Id.* at 30 (2nd Am. Compl. ¶ 96).  The dealership also

never presented plaintiff with the odometer disclosure statement for her signature.  *Id.* at 25 (2nd

Am. Compl. ¶ 81).

*Payment of the Loan*

On January 18, 2019, plaintiff tried to make her first loan payment to Chrysler Capital. *Id.* at 22 (2nd Am. Compl. ¶ 74). Chrysler Capital informed her that there was no loan. *Id.* In February 2019, Chrysler Capital purchased plaintiff's loan from Aristocrat Motors, and plaintiff made her first loan payment in mid-February. *Id.* at 22–23 (2nd Am. Compl. ¶¶ 75–76). Plaintiff made timely payments from February 2019 to July 2021, when she discovered the depth and details of defendants' alleged fraud. *Id.* at 33 (2nd Am. Compl. ¶ 107). On August 4, 2021, plaintiff sent the dealership and Chrysler Capital a notice of recission based on fraud. *Id.* at 28 (2nd Am. Compl. ¶ 91). Defendants Chrysler Capital and its parent company, defendant Santander Consumer USA, Inc., subsequently began collection efforts. *Id.* at 33–34 (2nd Am. Compl. ¶ 108). These efforts involved derogatory credit reports, harassing letters and phone calls, and placing the vehicle on a repossession list. *Id.*

*Two Lawsuits*

Plaintiff filed her first lawsuit premised on the vehicle's purchase and financing dispute in Johnson County, Kansas District Court on January 10, 2022. *See* Doc. 121-3 at 32 (showing state court docketed case 22CV00108 as filed on 01/10/2022). Two days later, plaintiff filed this federal case—premised on the same underlying dispute—in the Western District of Missouri. *See* Doc. 1.

## II.     *Colorado River* Doctrine

Defendants ask the court to stay or dismiss the present case under the *Colorado River* doctrine. Doc. 120 at 1–2. "The *Colorado River* doctrine establishes certain factors for a district court to consider when deciding whether to dismiss or stay a federal suit that parallels a state court proceeding." *Health Care & Ret. Corp. of Am. v. Heartland Home Care, Inc.*, 324 F. Supp. 2d 1202, 1204 (D. Kan. 2004) (citing *Rienhardt v. Kelly*, 164 F.3d 1296, 1302 (10th Cir.

4

1999), *abrogated on other grounds by Marshall v. Marshall*, 547 U.S. 293 (2006)).  "Although

not a true form of abstention, the doctrine is often treated as a variety of abstention[.]"  *Fox v.*

*Maulding*, 16 F.3d 1079, 1080 (10th Cir. 1994) (citations omitted).  "Abstention from the

exercise of federal jurisdiction is the exception, not the rule."  *Colo. River*, 424 U.S. at 813.

Federal courts have a "'virtually unflagging obligation . . . to exercise the jurisdiction given

them.'"  *D.A. Osguthorpe Fam. P'ship v. ASC Utah, Inc.*, 705 F.3d 1223, 1233 (10th Cir. 2013)

(quoting *Colo. River*, 424 U.S. at 817).  But that obligation "is not absolute."  *Id.*  Indeed, it "is

well-established that federal courts have the power to refrain from hearing, among other things,

cases which are duplicative of a pending state proceeding."  *Id.* (quotation cleaned up).  The

*Colorado River* doctrine is one manifestation of this well-established restraint.  *Id.*

At "the core of the *Colorado River* doctrine" is the desire to avoid "duplicative

litigation[.]"  *Id.*  The doctrine serves to promote "efficiency and economy.  Its goal is to

preserve judicial resources."  *Id.* (quotation cleaned up).  The Supreme Court, when adopting the

doctrine, identified the principles supporting it:  "wise judicial administration, giving regard to

conservation of judicial resources and comprehensive disposition of litigation."  *Colo. River*, 424

U.S. at 817 (quotation cleaned up).  The Court also provided four non-exhaustive factors that

justify applying the doctrine in a given case.  *Id.* at 818.  Seven years later, the Court expanded

on those factors—adding three more.  *See Moses H. Cone Mem'l Hosp. v. Mercury Constr.*

*Corp.*, 460 U.S. 1, 17 n.20, 23–27 (1983).

Before a court can address the seven[3] *Colorado River* factors, it must first address a

threshold question:  "whether the state and federal proceedings are parallel."  *Fox*, 16 F.3d at

---

[3]        Some, but not all cases—including some Tenth Circuit cases—recognize an eighth factor as well.
*Compare D.A. Osguthorpe*, 705 F.3d at 1234–36 (considering only four factors identified in *Colorado*
*River* and three additional factors derived from *Moses H. Cone*), *and Ute Indian Tribe of the Uintah &*
*Ouray Rsrv. v. Lawrence*, 22 F.4th 892, 913–14 (10th Cir. 2022) (Briscoe, J., dissenting) (same), *with*

1081; *see also United States v. City of Las Cruces*, 289 F.3d 1170, 1182 (10th Cir. 2002) ("[A] finding of parallel proceedings is a threshold condition for engaging in the *Colorado River* analysis.").

## III.        Parallel Cases

To cross the parallel-case threshold, two cases needn't mirror one another precisely. *See City of Las Cruces*, 289 F.3d at 1182 ("[I]n the *Colorado River* context . . . exact identity of parties and issues is not required."). Indeed, suits "may be parallel even if they are far from identical." *CNSP, Inc. v. City of Santa Fe*, 753 F. App'x 584, 589 (10th Cir. 2018) (quotation cleaned up). Instead, our Circuit deems two cases "'parallel if substantially the same parties litigate substantially the same issues in different forums.'" *Id.* at 588 (quoting *Fox*, 16 F.3d at 1081). The court thus evaluates the similarity of the parties, followed by the similarity of the issues, below, to discern whether the two cases here are parallel.

### A.        Substantially the Same Parties

*First*, consider the parties. The plaintiff in each case is identical. And side-by-side comparison of the operative federal Complaint and state court Petition reveals an exact overlap

---

*Wakaya Perfection, LLC v. Youngevity Int'l, Inc.*, 910 F.3d 1118, 1122 (10th Cir. 2018) (listing eight *Colorado River* factors), *and Foxfield Villa Assocs., LLC v. Regnier*, 918 F. Supp. 2d 1192, 1198, 1204 (D. Kan. 2013) (considering eighth factor but clarifying it is only considered by "some courts"). The eighth factor emerged when courts other than the Supreme Court applied the doctrine and considered forum shopping. *See Fox*, 16 F.3d at 1081 (identifying the forum shopping factor as having derived from "[o]ther courts" and citing a Ninth Circuit case in support).

Recall that the Supreme Court has directed lower courts to apply the *Colorado River* factors in "'a pragmatic, flexible manner with a view to the realities of the case at hand.'" *D.A. Osguthorpe*, 705 F.3d at 1235–36 (quoting *Moses H. Cone*, 460 U.S. at 21). Neither party argues the eighth factor, forum shopping, applies here. *See generally* Doc. 121; Doc. 177. And the court finds no indication on the record that forum shopping figures into "'the realities of the case at hand.'" *D.A. Osguthorpe*, 705 F.3d at 1235–36 (quoting *Moses H. Cone*, 460 U.S. at 21). And so, the court's analysis here considers only seven factors.

of eight defendants.[4]  Only three defendants diverge.  The state case lists one defendant not in the

federal court case:  Kevin Killilea.  *Compare* Doc. 46 at 1 (2nd Am. Compl.) *with* Doc. 121-2 at

1 (1st Am. Pet.).  The First Amended Petition identifies Mr. Killilea as the Vice President of

Aristocrat Motors/Soave Automotive Group.  Doc. 121-2 at 2 (1st Am. Pet. ¶ 8).  Aristocrat

Motors and Soave Automotive Group are defendants in both actions.  Doc. 46 at 1 (2nd Am.

Compl.); Doc. 121-2 at 1 (1st Am. Pet.).  Tellingly, the same law firm represents Mr. Killilea in

the state suit as represents Aristocrat Motors and Soave Automotive in both suits.  *See* Doc. 121-

3 at 1 (showing state court docket entry where Patric S. Linden enters his appearance for Kevin

Killilea); Doc. 121 at 13 (identifying Patric S. Linden as attorney for defendant Soave

Automotive Group).  Given the employee relationship that drives Mr. Killilea's association with

the state suit and his employer's presence in each action, the court concludes Mr. Killilea's

absence in the federal case is immaterial to the parallel case analysis.  *See Health Care & Ret.*

*Corp.*, 324 F. Supp. 2d at 1204 (finding absence of federal defendant in state action immaterial

because entity's affiliate was party to the state case and same law firm represents affiliate and

defendant); *Waddell & Reed Fin., Inc. v. Torchmark Corp.*, 180 F. Supp. 2d 1235, 1239 (D. Kan.

2001) (finding absence of state defendant in federal action immaterial because entity's parent

corporation was party to federal case and absent defendant operates "as a mere arm or extension"

of its parent corporation); *CNSP, Inc.*, 753 F. App'x at 589 (affirming district court's finding of

parallel cases despite absence of state court defendant in federal case).

---

[4]     In the federal case, the Second Amended Complaint lists defendants T.E.N. Investments, Inc. and
Aristocrat Motors—Mercedes Benz.  Doc. 46 at 1 (2nd Am. Compl.).  In the state case, the First
Amended Petition links them:  "T.E.N. Investments, Inc., *dba* Aristocrat Motors."  Doc. 121-2 at 1 (1st
Am. Pet.).  But the Second Amended Complaint in this federal suit later acknowledges the same
relationship reflected in the state court First Amended Petition, identifying "T.E.N. Investments, Inc.
d.b.a. Aristocrat Motors–Mercedes Benz."  Doc. 46 at 3 (2nd Am. Compl. ¶ 6).  The court thus tallies one
defendant here when reaching its total overlap number of eight.

Two defendants in this federal case aren't parties in the state case:  Santander Consumer USA, Inc. and Chrysler Capital.[5]  Doc. 46 at 1 (2nd Am. Compl.); Doc. 121-2 at 1 (1st Am. Pet.).  But plaintiff's state court allegations nonetheless repeatedly refer to these two entities. *See, e.g.*, Doc. 121-2 at 7 (1st Am. Pet. ¶ 46) ("Plaintiff checked her credit report and discovered no inquiries from Aristocrat Motors, or Chrysler Capital/Santander.").  And, not infrequently, the state court Petition identifies these two entities as "defendants."  *See, e.g.*, *id.* at 21 (1st Am. Pet. ¶¶ 121–22) ("Defendants Santander / Chrysler Capital have now begun to harass the Plaintiff. . . . The vehicle was placed on Defendants' Chrysler/Santander list for repossession[.]").  And the state court Petition includes them in a list of defendants who are parties to both cases.  *Id.* (1st Am. Pet. ¶ 125) ("Defendants Robert, Aristocrat, Ten, Santander, Kevin, Battaglia, Chrysler, Santander knew the sale was void[.]").  This overlap obviates any concern that Santander and Chrysler Capital forestall a parallel case finding here.  *See Waddell & Reed*, 180 F. Supp. 2d at 1239–40 (concluding two federal defendants—unnamed in the state court case—couldn't "destroy the parallel nature of the cases" because the defendants nonetheless appear in the state case as "non-party wrongdoers").

The court thus concludes the cases at issue here meet the first part of the parallel case analysis—substantially the same parties.  The court completes the analysis, next.

### B.    Substantially the Same Issues

---

[5]    In her Second Amended Complaint, plaintiff alleges that Chrysler Capital is a subsidiary of Santander Consumer.  Doc. 46 at 3 (2nd Am. Compl. ¶ 5).  And she explicitly refers to them collectively thereafter as Chrysler Capital.  *Id.*  In her state court First Amended Petition, plaintiff once again couples the two referring to them together as:  "Chrysler Capital / Santander."  Doc. 121-2 at 7 (1st Am. Pet. ¶ 46).  She then alternates between "Chrysler Capital" and "Santander/Chrysler" in subsequent references in the state court Petition.  *See, e.g.*, Doc. 121-2 at 20 (1st Am. Pet. ¶¶ 118–119) ("The Defendants Chrysler Capital informed the Plaintiff . . . that no collection efforts or derogatory credit reporting would take place . . . Despite these Defendants Santander/Chrysler assertions to protect the Plaintiff in the interim, the Defendants reported derogatory late payments[.]").  Given this constellation of references, the court assumes plaintiff intends to identify both Santander and Chrysler Capital each time the state Petition uses Chrysler Capital.

*Second*, consider the issues. Both cases revolve around plaintiff's purchase—or attempted purchase—of a Porsche and the loan application, retail installment contract, transfer of title, and debt collection efforts associated with that purchase. The First Amended Petition and the Second Amended Complaint progress through the same set of facts. *See generally* Doc. 121-2 (1st Am. Pet.); Doc. 46 (2nd Am. Compl.). Both begin with the first owner's purchase of the vehicle around April 3, 2015. Doc. 121-2 at 3–4 (1st Am. Pet. ¶ 19); Doc. 46 at 6–7 (2nd Am. Compl. ¶ 21). And both conclude with plaintiff's allegations against Santander and Chrysler for derogatory credit reporting and harassing collection efforts—while hitting all the same highlights in between. Doc. 121-2 at 20–21 (1st Am. Pet. ¶¶ 119–122); Doc. 46 at 33–34 (2nd Am. Compl. ¶¶ 108–110). Some allegations are almost word-for-word transplants from the Petition to the Complaint. *Compare, e.g.*, Doc. 121-2 at 20 (1st Am. Pet. ¶ 118), *with* Doc. 46 at 33 (2nd Am. Compl. ¶ 108). The two cases thus involve litigation of substantially—or precisely—the same underlying dispute.

To be sure, plaintiff asserts a broader range of claims in the federal case. But that alone doesn't disrupt the parallel case analysis. *See Waddell & Reed*, 180 F. Supp. 2d at 1240 (concluding that cases are parallel even when federal suit claims "are broader" than state suit claims because "both cases nevertheless involve litigation of substantially the same underlying dispute—the negotiation and execution of a compensation agreement"). And even though plaintiff brings claims premised on federal statutes in the federal case but not in the state case, that, too, doesn't eliminate the parallel nature of the cases. *See id.* (explaining that RICO claim included in federal case but not state case doesn't negate parallel case finding because RICO claim "arises from many of the same facts as the claims asserted in the [state] case"); *Foxfield Villa Assocs.*, 918 F. Supp. 2d at 1197–98 (concluding cases parallel where both arise from same

9

loan transaction—despite addition of RICO claim in federal action—because RICO claim was

"based on many of the same facts at issue in the state action").

The court is mindful that plaintiff's federal case involves more than just a singular RICO

claim, though RICO is on the list. But plaintiff bases all ten federal counts—when one drills

down—on the same facts that are at issue in the state court action.[6] At bottom, these two cases

---

[6]      Plaintiff's federal statute-based claims all rest on the facts alleged in her state court case, as
explained in detail below. Plaintiff brings claims under the following federal statutes: Federal Odometer
Law (Count I), Fair Debt Collection Practices Act (Count II), RICO (Counts III & IV), Magnunson-Moss
Act (Count V), Fair Credit Reporting Act (Count VII), Truth in Lending Act (Count IX), and Telephone
Consumer Protection Act (Count X). Doc. 46 at 36–61 (2nd Am. Compl.). Plaintiff also invokes the
Federal Trade Commission's "Holder Rule" in Count VI. *Id.* at 48–49 (2nd Am. Compl.). Her federal
case premises the following claims on the following events:

- Counts I, III, and V—at least in part—on alleged false mileage statements. Doc. 46 at 36, 41, 47
  (2nd Am. Compl.). Plaintiff alleged false mileage statements in her state court action. Doc. 121-
  2 at 5, 25 (1st Am. Pet. ¶¶ 28–29, 154).
- Counts II, III, IV and IX—again, in part—on alleged forgery of plaintiff's name on the retail
  installment contract, resulting in a fraud. Doc. 46 at 37, 39, 44–45, 55–56 (2nd Am. Compl.).
  Plaintiff alleged forgery of her name on the retail installment contract, resulting in fraud, in her
  state court action. Doc. 121-2 at 18, 22 (1st Am. Pet. ¶¶ 106–07, 133).
- Counts II, III, VII, VIII, IX and X—in part—on never fully executing the retail installment
  contract, and thus never purchasing the vehicle. Doc. 46 at 37, 42, 50, 53, 55, 59. Plaintiff
  alleged that she never fully executed the retail installment contract—and thus never purchased the
  vehicle—in her state court action. Doc. 121-2 at 17, 21 (1st Am. Pet. ¶¶ 103, 122).
- Count III—in part—on improper transfer of title and forgeries on the title. Doc. 46 at 39, 41 (2nd
  Am. Compl.). Plaintiff alleged improper transfer of title and forgeries on the title in her state
  court action. Doc. 121-2 at 4, 5, 14, 17, 22 (1st Am. Pet. ¶¶ 21–27, 30–35, 82, 102, 133).
- Count IV and V—in part—on the vehicle's alleged condition, unmerchantability, and
  unavailability of written warranties. Doc. 46 at 44, 46–47 (2nd Am. Compl.). Plaintiff alleged
  vehicle condition, unmerchantability, and warranty disputes in her state court action. Doc. 121-2
  at 10, 11–12, 22, 24 (1st Am. Pet. ¶¶ 67, 72, 127, 132, 151).
- Count VII—in part—on defendants' alleged failure to run plaintiff's credit and furnishing false,
  derogatory credit information to credit reporting agencies. Doc. 46 at 49–50 (2nd Am. Compl.).
  Plaintiff alleged defendants didn't run her credit and furnished false, derogatory credit
  information in her state court action. Doc. 121-2 at 7, 8, 20 (1st Am. Pet. ¶¶ 47, 51, 119).
- Count IX—in part—on the wrong start date on the loan. Doc. 46 at 54–55 (2nd Am. Compl.).
  Plaintiff alleged similar start date issues in her state court action. Doc. 121-2 at 8–9 (1st Am.
  Pet. ¶¶ 53–56).

Count VI asserts that, under "the Federal Trade Commission's 'Holder Rule,' Chrysler Capital and
Santander Consumer USA is liable to plaintiff for all of Plaintiff's claims against [the other
defendants]." Doc. 46 at 49 (2nd Am. Compl.). It asserts no separate basis for a claim. Count VI
thus rests on the same factual allegations as the other nine counts. These bullet points demonstrate

involve the same events and the same underlying dispute.  The parties thus are litigating

"substantially the same issues in different forums." *Fox*, 16 F.3d at 1081.  Given this conclusion,

the court concludes the federal and state actions here are parallel cases.  With this threshold

question answered, the court turns to the *Colorado River* factors.

## IV.    *Colorado River* Factors

### A.    The First Four Factors

When the Supreme Court first adopted the *Colorado River* doctrine, it provided four

factors to aid courts when determining whether a given case warranted stay or dismissal.  *D.A.*

*Osguthorpe*, 705 F.3d at 1234.  "These four factors are:  (1) whether the state or federal court

first assumed jurisdiction over the same res; (2) the 'inconvenience of the federal forum'; (3) 'the

desirability of avoiding piecemeal litigation'; and (4) 'the order in which jurisdiction was

obtained by the concurrent forums.'"  *Id.* (quoting *Colo. River*, 424 U.S. at 818).  The Court

advised that "[n]o one factor is necessarily determinative[.]"  *Colo. River*, 424 U.S. at 818.  And

it cautioned that only "the clearest of justifications will warrant dismissal."  *Id.* at 819.  In a later

case addressing the doctrine, the Court reiterated that the factors don't function as a "mechanical

checklist" and so "[t]he weight to be given to any one factor may vary greatly from case to case."

*Moses H. Cone*, 460 U.S. at 16.  That is, "the *Colorado River* factors must 'be applied in a

pragmatic, flexible manner with a view to the realities of the case at hand.'"  *D.A. Osguthorpe*,

705 F.3d at 1235–36 (quoting *Moses H. Cone*, 460 U.S. at 21).  With this guidance firmly in

view, the court weighs the four factors in the present case, below.

---

that all other nine counts rely on the same underlying dispute as informs plaintiff's state action.
Neither Count VI—nor any of the other federal statute-based counts—thus destroy a parallel cases
finding.

The first two factors don't apply to this case.  To begin, there is no res or property over which either court could assume jurisdiction.  The first factor, thus, is neutral.  *See Health Care & Ret. Corp.*, 324 F. Supp. 2d at 1205 (identifying factor as "neutral" when "neither court has assumed jurisdiction over property").  Nor does a geographical disparity render the federal forum inconvenient under the second factor.  *See id.* at 1206 ("Whether the federal forum is inconvenient depends on the physical proximity of the federal forum to the evidence and witnesses." (quotation cleaned up)).  Both the state court forum— Johnson County, Kansas—and this court hold court in the greater Kansas City metropolitan area, their courthouses situated about 23 miles apart.  *See id.* (finding inconvenient forum factor neutral when 60 miles between forums).  And no party has suggested any inconvenience.  *See D.A. Osguthorpe*, 705 F.3d at 1234 (affording "scant weight" to inconvenient forum factor when state and federal forums were "at no great geographical distance from each other, and no party ha[d] suggested any physical or logistical inconvenience").  So, this second factor is also neutral, as well.

The third factor—avoiding piecemeal litigation—isn't neutral, however.  The piecemeal factor "was paramount in *Colorado River* itself[.]"  *Moses H. Cone*, 460 U.S. at 19.  "'Piecemeal litigation occurs when different tribunals consider the same issue, thereby duplicating efforts and possibly reaching different results.'"  *Leago v. Ricks*, No. 20-cv-03297-NRN, 2021 WL 2650316, at *4 (D. Colo. June 28, 2021) (quoting *Am. Int'l Underwriters, Inc. v. Cont'l Ins. Co.*, 843 F.2d 1253, 1258 (9th Cir. 1988)).  When assessing this factor, courts consider the degree to which the issues overlap in the state court and federal court cases.  *See Foxfield Villa Assocs.*, 918 F. Supp. 2d at 1199 ("[D]uplication of proceedings is almost certain to occur, as the issues being litigated in state court mirror those before the court in this action. . . . [T]he issues and factual circumstances in both cases are nearly identical."); *Cassino v. JPMorgan Chase Bank*

12

*Nat'l Ass'n*, No. 20-cv-03228-RM-KLM, 2021 WL 3666964, at \*5 (D. Colo. Aug. 17, 2021) ("[T]his Court would be considering many of the same issues as the state court. . . . Therefore, due to the substantial risk of piecemeal litigation were this action to continue, the Court finds that this factor weighs heavily in favor of abstention." (quotation cleaned up)); *Tetra Tech Inc. v. Town of Lyons*, 641 F. Supp. 3d 1042, 1061–62 (D. Colo. 2022) ("[T]he Court finds that the relief Plaintiffs seek in this action . . . would certainly result in this Court considering the same issues that the state court has already ordered to be submitted to binding arbitration. . . . [T]he Court finds this factor weighs significantly in favor of abstention.").

Here, the state and federal cases turn on the same issues and factual circumstances, as the court already has outlined, *see* § III.B. Plaintiff's purchase of a used vehicle, disputes about accompanying documentation, and disputes about collection efforts for the affiliated loan fuel both the state and federal actions here. So, the cases turn on an identical underlying dispute. Indeed, the court demonstrated—in footnote six, above—that the claims in each one of plaintiff's ten counts in this case rely on allegations she also presented in state court. Such overlap suggests there's considerable risk of wasted judicial resources[7] and potentially inconsistent results. *See Health Care & Ret. Corp.*, 324 F. Supp. 2d at 1206 (explaining that possibility of inconsistent results and the waste of court's and parties' resources justified staying the case to best promote judicial economy). And so, this factor heavily favors applying the *Colorado River* doctrine to stay or dismiss this case.

---

[7] The strain on judicial resources is a weighty consideration in this case because plaintiff is a prolific filer. Even after United States Magistrate Judge James has made a considerable dent, there are still 39 plaintiff-filed motions pending to date—all filed in the last three months. This mountain of pending motions exceeds that of any other case on the court's docket. So, plaintiff not only asks this court to resolve the same underlying dispute as the state court, but she asks it to do so in a voluminous, resource-intensive fashion. Her prolific filing heightens the court's concern about the waste of judicial resources if the cases in both forums proceed.

The fourth *Colorado River* factor concerns the order in which the respective courts secured jurisdiction. "In applying this factor, 'priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions.'" *D.A. Osguthorpe*, 705 F.3d at 1235 (quoting *Moses H. Cone*, 460 U.S. at 21). Here, plaintiff filed the two actions just days apart. *See* Doc.121-3 at 32 (indicating on state court docket that plaintiff filed state case on January 10, 2022); Doc. 1 (indicating plaintiff filed federal case on January 12, 2022). But the state court action has progressed considerably further than the federal action.

Discovery closed in the state court action on October 2, 2023. Doc. 121-1 at 3 (Welch Aff. ¶ 14). By contrast, discovery is still ongoing in the federal case. Doc. 135 at 2 (setting discovery deadline for December 9, 2024). And defendants already filed a motion for summary judgment in the state court action. *See* Doc. 121-3 at 4 (showing defendants' joint summary judgment motion filed in state action on October 16, 2023). The state court hasn't ruled that summary judgment motion because plaintiff filed an appeal. *Id.* at 2 (indicating notice of appeal file stamped October 26, 2023). But this court's recent review of the state court's docket indicates that the Kansas Court of Appeals dismissed plaintiff's appeal for lack of final decision on October 3, 2024. *Case History, Case 22CV00108*, Johnson County Courts, https://public.jococourts.org/civroa.aspx (last visited October 24, 2024). And so, the state court once again is poised to rule the dispositive motions in the state case. Tenth Circuit precedent suggests that when "the parallel state litigation will end the parties' dispute[,]" a stay or dismissal under *Colorado River* is appropriate. *Waddell & Reed*, 180 F. Supp. 2d at 1242 (citation omitted). The significant overlap in the issues before the state and federal courts here means that the state court's decision on a dispositive motion (like defendants' joint summary judgment

14

motion) could end the dispute. By contrast, the dispositive motions' deadline in this federal case is still months away. *See* Doc. 135 at 2 (setting dispositive motions deadline for February 14, 2025). Because the state case leads the federal case on both the discovery and dispositive motions fronts, this factor strongly favors a stay or dismissal of the federal case.

To recap, the current scoreboard reads two factors in the neutral column and two factors in the stay or dismissal column. So far, no factors disfavor the doctrine's application. The court turns next to the additional *Moses H. Cone* factors.

### B.    The Last Three Factors

In *Moses H. Cone*, the Supreme "Court supplemented its original *Colorado River* factors for courts to weigh when deciding the appropriateness of abstention." *D.A. Osguthorpe*, 705 F.3d at 1235. The first two *Moses H. Cone* additions allow a court to "look to whether 'federal law provides the rule of decision on the merits' and whether the state-court proceedings adequately protect the litigants' rights[.]" *Id.* (internal citations omitted) (quoting *Moses H. Cone*, 460 U.S. at 23, 26–27). Then, in dictum, "the Court also strongly suggested that a court may take into account the possibly 'vexatious or reactive nature of either the federal or state litigation.'" *Id.* (quoting *Moses H. Cone*, 460 U.S. at 17 n.20).

*Moses H. Cone*'s first additional factor—whether federal law provides the rule of decision on the merits—carries less weight when federal and state courts have concurrent jurisdiction. *See Waddell & Reed*, 180 F. Supp. 2d at 1242 (citing *Nakash v. Marciano*, 882 F.2d 1411, 1416 (9th Cir. 1989) (this factor becomes less significant when state and federal courts have concurrent jurisdiction over claim)). And so, even if a federal statute "will govern the merits of [plaintiff's] . . . claims, this factor does not automatically compel the conclusion that the resolution of a claim arising under the [federal] Act is a task better suited for federal courts." *D.A. Osguthorpe*, 705 F.3d at 1235. Nonetheless, presence of a claim controlled by federal law

tips the balance in favor of the federal court retaining jurisdiction. *Waddell & Reed*, 180 F. Supp. 2d at 1242 ("Because federal law controls the RICO claim, however, this factor slightly favors retaining the federal case.").

Here, one of plaintiff's claims in her federal case is governed by Missouri law. Plaintiff brings a claim for violations of Missouri's Unlawful Merchandising Practices Act. Doc. 46 at 53 (2nd Am. Compl.). She also asserts claims "in addition or in the alternative" for "violations of the Kansas Consumer Protection Act.[.]" *Id.* But a majority of plaintiff's claims in this federal case are governed by federal law.[8] Doc. 46 at 36–61 (2nd Am. Compl.). And so, though it doesn't compel retention, this factor favors retaining jurisdiction over the federal case.

The second factor introduced by *Moses H. Cone* concerns the state court's adequacy as a forum to protect the parties' rights. *Moses H. Cone* concluded that there was "substantial room for doubt" whether the state court could provide the relief sought in the federal case there. 460 U.S. at 26–27. A little context helps. In the federal court version of *Moses H. Cone*, plaintiff sought an order to compel arbitration under § 4 of the Federal Arbitration Act. *Id.* at 26. The Court explained that § 3 of the Arbitration Act obliged state courts—just as much as federal courts—to grant stays of litigation. *Id.* But § 4 was a different story. The Court noted it was "less clear" whether § 4 also obliged state courts—as it did federal courts—to issue an order compelling arbitration. *Id.* And, the Court clarified, a § 3 stay wouldn't provide adequate protection given the circumstances of the case. *Id.* at 27. It had to be § 4. *Id.* at 26–27. Because the particular statute at issue in *Moses H. Cone* imposed potentially different obligations on state

---

[8]     Recall that plaintiff brings claims under the following federal statutes: Federal Odometer Law (Count I), Fair Debt Collection Practices Act (Count II), RICO (Counts III & IV), Magnunson-Moss Act (Count V), Fair Credit Reporting Act (Count VII), Truth in Lending Act (Count IX), and Telephone Consumer Protection Act (Count X). Doc. 46 at 36–61 (2nd Am. Compl.). Plaintiff also invokes the Federal Trade Commission's "Holder Rule" (Count VI). *Id.* at 48–49 (2nd Am. Compl.).

and federal courts, the Court declined to stay the case under *Colorado River* doctrine. *Id.* at 26–28. But here, no similar concern emerges.

For certain, plaintiff has filed Motions to Compel Arbitration in this case. *See* Doc. 89; Doc. 166. But even when a court must decide a matter under the Federal Arbitration Act, that "does not automatically compel the conclusion that the resolution of a claim arising under the Act is a task better suited for the federal courts." *D.A. Osguthorpe*, 705 F.3d at 1235. And even if it did warrant that conclusion, our court already has decided plaintiff's Motion to Compel.[9]

---

[9]     Plaintiff later filed an untimely request for review of Magistrate Judge James's Order denying plaintiff's Motion to Compel Arbitration (Doc. 89). Doc. 138. But that request came months after the earlier ruling on arbitrability. *See* Doc. 101 (denying arbitration motion issued November 16, 2023); Doc. 138 (requesting review filed nine months later, on August 14, 2024). That's far beyond the 14-day objection window allowed by Fed. R. Civ. P. 72(a) (even when the court accounts for the bankruptcy stay)—and so the court needn't consider it. *See* Doc. 110 (staying case on November 29, 2023); Doc. 114 at 2 (lifting stay on July 3, 2024). One last thing: plaintiff filed another motion, asking the court to reconsider compelling arbitration. Doc. 166. But nothing has changed since the court ruled on the first Motion to Compel Arbitration.

Most recently, plaintiff argues—based on a forum selection clause in the parties' arbitration agreement—that this court doesn't have jurisdiction to rule a motion to compel arbitration at all. *See* Doc. 300 at 1–2. And she requests transfer to a third federal forum (fourth judicial forum in total) under 28 U.S.C. § 1404(a) or dismissal under *forum non conveniens*. *Id.* This motion comes just days after she petitioned the Tenth Circuit for a Writ of Mandamus. Doc. 289. That Petition, if successful, would require this court to rule her arbitration motion—an act, she now asserts, this court lacks jurisdiction to take. Doc. 289. Setting aside the internal inconsistency of plaintiff's various motions (and the whiplash associated with it), the court addresses plaintiff's newest motion. It explains why any applicable forum selection clause here neither divests it of subject matter jurisdiction nor affects its *Colorado River* analysis.

A forum selection clause doesn't divest a court of subject matter jurisdiction. *See Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC*, 953 F.3d 660, 666 (10th Cir. 2020) ("[T]he scope of a federal court's subject matter jurisdiction is governed exclusively by acts of Congress. And when Congress grants subject matter jurisdiction, no other entity—not the litigants and not the states—can divest a federal court of the same." (footnote omitted)). Instead, "[e]ven where a federal court has subject matter jurisdiction, 'a valid forum selection clause may prohibit a federal court from exercising jurisdiction if the parties contractually agreed to litigate the matter elsewhere.'" *Key Constr., Inc. v. W. Sur. Co.*, No. 22-1247-DDC-ADM, 2023 WL 2187291, at *1 (D. Kan. Feb. 23, 2023) (quoting *K.R.W. Constr., Inc. v. Stronghold Eng'g Inc.*, 598 F. Supp. 3d 1129, 1135–36 (D. Kan. 2022)). So, the question isn't whether the court possesses subject-matter jurisdiction. Instead, it's whether a valid forum-selection clause prohibits exercise of that jurisdiction here. *See id.*

Doc. 99 at 4 ("Plaintiff has substantially invoked litigation machinery and acted inconsistent with the right to arbitrate by filing this lawsuit, . . . engaging in discovery and extensive motion practice . . . combined with a delay of nearly 19 months before filing her motion to stay and compel arbitration[.]"); Doc. 101. So, plaintiff's Motions to Compel Arbitration—already decided—don't necessitate a federal forum.

What's more, the state court maintains concurrent jurisdiction over the federal statutes plaintiff invokes. *See* Federal Odometer Act, 49 U.S.C. § 32710(b) ("A person may bring a civil action to enforce a claim under this section in an appropriate United States district court or in another court of competent jurisdiction."); *Foxfield Villa Assocs.*, 918 F. Supp. 2d at 1200 ("It is

---

While "a valid forum-selection clause should be given controlling weight in all but the most exceptional cases," plaintiff has waived her right to invoke such a clause here. *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 63 (2013) (quotation cleaned up). Many courts apply the same standard to analyze waiver of a forum-selection clause as they do to analyze waiver of an arbitration clause. *See, e.g.*, *Se. Power Grp., Inc. v. Vision 33, Inc.*, 855 F. App'x 531, 534–35 (11th Cir. 2021) (applying arbitration waiver standard to forum selection clause waiver after recognizing "that arbitration clauses are similar to forum-selection clauses" (quotation cleaned up)); *NRRM, LLC v. Endurance Warranty Servs., LLC*, No. 24-cv-01128-SEP, 2024 WL 4533522, at *3 (E.D. Mo. Oct. 21, 2024) (same). Here's the relevant standard: "A forum-selection clause will not be deemed waived unless (1) the party invoking the clause has taken action inconsistent with it or has delayed its enforcement, and (2) the other party would be prejudiced by its enforcement." *Pizza Inn, Inc. v. Odetallah*, No. CIV-21-00322-PRW, 2022 WL 1671122, at *3 n.19 (W.D. Okla. May 25, 2022) (quotation cleaned up) (explaining that party may effectively waive "forum-selection clause by taking litigation actions inconsistent with the clause—namely, by filing suit" in another forum).

This court already decided that plaintiff waived her right to arbitrate. Doc. 99; Doc. 101. The court found waiver because plaintiff had "substantially invoked litigation machinery[,]" "acted inconsistent with the right to arbitrate," and delayed invoking the arbitration clause for nearly 19 months. Doc. 99 at 4. By the same token, plaintiff has waived her right to invoke the forum selection clause now. Plaintiff continues to engage in vigorous litigation in this forum—see as support the 39 pending, plaintiff-filed motions on the court's docket. And she has delayed invoking enforcement of this forum selection clause for nearly three years—since filing her Complaint in January 2022. Defendants already have litigated the dispute simultaneously in plaintiff's chosen state and federal forums. What's more, plaintiff already transferred her federal case once. *See* Doc. 85 (granting plaintiff's Motion to Transfer Venue from Western District of Missouri to District of Kansas). If plaintiff wanted to invoke the forum selection clause, she should have figured it out earlier. At this stage, introducing a fourth forum would prejudice defendants—to say nothing of the continued drain on judicial resources this Order plugs. Plaintiff has waived her right to invoke the forum selection clause and so no valid clause inheres here. This Order thus stands unaffected by plaintiff's most recent Motion to Transfer or Dismiss (Doc. 300).

well-established that state courts have concurrent jurisdiction to consider RICO claims." (citation omitted)); Federal Debt Collection Practices Act, 15 U.S.C. § 1692k(d) ("An action to enforce any liability created by this subchapter may be brought in any appropriate United States district court without regard to the amount in controversy, or in any other court of competent jurisdiction[.]"); *Abraham v. Volkswagen of Am., Inc.*, 795 F.2d 238, 241 (2d Cir. 1986) ("Federal and state courts have concurrent jurisdiction over Magnuson-Moss actions."); Fair Credit Reporting Act, 15 U.S.C. § 1681p ("An action to enforce any liability created under this subchapter may be brought in any appropriate United States district court, without regard to the amount in controversy, or in any other court of competent jurisdiction[.]"); Truth in Lending Act, 15 U.S.C. § 1640(e) ("[A]ny action under this section may be brought in any United States district court, or in any other court of competent jurisdiction[.]"); *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012) ("We hold, therefore, that federal and state courts have concurrent jurisdiction over private suits arising under the TCPA [Telephone Consumer Protection Act].").  Given this concurrent jurisdiction, the court finds no reason to conclude that the state court couldn't provide adequate relief here.  And so, this factor is neutral.

And, at last, the final factor:  the reactive or vexatious nature of either case.  Not all courts address this factor.  *See, e.g.*, *Health Care & Ret. Corp.*, 324 F. Supp. 2d at 1205–08 (considering four factors found in *Colorado River* and first two factors found in *Moses H. Cone*, but not addressing vexatious or reactive factor).  But those courts who do typically find a case reactive when it's filed in response to an occurrence in the other case.  *See D.A. Osguthorpe*, 705 F.3d at 1235 (explaining that plaintiff "came to the federal courts for relief only after receiving an unfavorable state-court ruling on arbitrability several years after litigation had begun in [the] state-court system"); *Ute Indian Tribe*, 22 F.4th at 916 (Briscoe, J., dissenting) ("[T]he record

makes abundantly clear that the Tribe's filing of its federal lawsuit was reactive in nature, coming only after the Tribe had unsuccessfully attempted in both the state district court and the Utah appellate courts to have Becker's suit dismissed[.]")  Here, defendants don't argue plaintiff filed her federal case in reaction to any state court decision.  And with good reason:  the state court hadn't ruled on anything yet when plaintiff filed her federal case just two days later.  *See* Doc.121-3 at 32 (indicating on state court docket that plaintiff filed state case on January 10, 2022); Doc. 1 (indicating plaintiff filed federal case on January 12, 2022).  Plaintiff left the state court no time to act and, thus, had nothing to react to.  The reactive portion of this factor thus appears neutral.  But courts have afforded vexatious—addressed next—a slightly different meaning.

Turning to vexatiousness, courts have interpreted a case's filing as vexatious when a plaintiff could have asserted the requested relief in the other, already-filed action.  *See Tetra Tech*, 641 F. Supp. 3d at 1062 ("[T]he initiation of this consolidated action appears to be . . . vexatious insofar as Plaintiffs seek relief which was or could have been asserted in the [other] Action"); *Cassino*, 2021 WL 3666964, at *5 ("[T]he case here appears to be . . . vexatious to the extent he asserts claims which were or which could have been asserted in the state court litigation.").  Here, plaintiff easily could have asserted the claims she brought in her federal action in state court—a court of general jurisdiction.  The factual underpinnings of the two cases are the same, as the court has explained repeatedly.  So, there was no reason for plaintiff to file a separate federal lawsuit when she could have asserted her various claims for relief under federal statutes in the already-filed state action.  Plaintiff's federal litigation fits the vexatious category, and this final factor tips slightly toward stay or dismissal.

V.      **Balance of the Factors**

In sum, three *Colorado River* factors are neutral—jurisdiction over a res, inconvenient federal forum, and adequate protection in the state forum. Two factors weigh strongly in favor of staying or dismissing the federal case—duplicative litigation and progress made in the respective cases. One factor weighs slightly in favor of stay or dismissal—the vexatious nature of the federal case. Finally, one factor weighs against stay or dismissal—federal law provides the rule of decision. Taken as a whole, the factors favor the court staying or dismissing the present case under the *Colorado River* doctrine. And, the court concludes, staying or dismissing this case aligns with the core principle of the *Colorado River* doctrine: avoiding duplicative litigation. *D.A. Osguthorpe*, 705 F.3d at 1233. Finally, staying or dismissing this case comports with *Colorado River*'s emphasis on judicial efficiency, economy, and the preservation of judicial resources. *Id.* The court best promotes these principles by either staying or dismissing this case. The court considers, next, which course of action to take.

VI.     **Stay or Dismiss**

The Tenth Circuit has expressed a clear preference for staying a federal action under *Colorado River*—instead of dismissing it—pending the outcome of state proceedings. *Fox*, 16 F.3d at 1083. That way, in "the event the state court proceedings do not resolve all the federal claims, a stay preserves an available federal forum in which to litigate the remaining claims[.]" *Id.* And so, abiding by our Circuit's guidance, the court chooses not to dismiss the case here.

Instead, the court will stay the case and close it administratively, an approach other district courts in our Circuit have taken. *See Leago*, 2021 WL 2650316, at *5 (staying and administratively closing case under *Colorado River* doctrine); *Tetra Tech*, 641 F. Supp. 3d at 1065 (administratively closing case under *Colorado River* doctrine and finding "administrative closure—rather than an indefinite stay of the proceedings—is more appropriate"); *Cassino*, 2021

WL 3666964, at *6 (finding a stay and administrative closure "most appropriate" under *Colorado River*). And our Circuit identified no problem with the stay-and-administratively-close approach when deciding whether an administrative closure under *Colorado River* allowed a plaintiff to reopen his case. *Cassino v. JP Morgan Chase Bank Nat'l Ass'n*, No. 22-1049, 2022 WL 3012270, at *3 (10th Cir. July 29, 2022).

What's more, this approach makes sense. When a court invokes the *Colorado River* doctrine, it "necessarily contemplates that the federal court will have nothing further to do in resolving any substantive part of the case[.]" *Moses H. Cone*, 460 U.S. at 28. And so it is here. Given the almost perfect overlap in factual allegations between this case and the state court case, this court anticipates the state court action will resolve the underlying dispute. But, out of an abundance of caution, an administrative closure allows this case to remain on the court's docket. *See Patterson v. Santini*, 631 F. App'x 531, 534 (10th Cir. 2015). Indeed, such an administrative closure "generally operates as 'the practical equivalent of a stay.'" *Id.* (quoting *Quinn v. CGR*, 828 F.2d 1463, 1465 & n.2 (10th Cir. 1987)). "Use of the administrative-closure mechanism allows district courts to remove from their pending cases suits which are temporarily active elsewhere (such as before an arbitration panel) or stayed (such as where a bankruptcy is pending)." *Id.* (quotation cleaned up). Here, the court concludes, a stay is appropriate under the *Colorado River* doctrine. Administratively closing the case maintains the case on the docket so that—if the court has miscalculated and more remains to be done after the state case—"it may be reopened upon request of the parties or on the court's own motion." *Id.* (quotation cleaned up).

Having stayed and administratively closed the case, the court needn't reach the merits of defendants' alternative claim-splitting argument, Doc. 121 at 12–13, or plaintiff's Motion to Strike, Doc. 177.[10]

## VII.        Conclusion

The court finds this present action and the state court proceedings premised on the same factual allegations are parallel cases under the *Colorado River* doctrine. And it concludes that the *Colorado River* factors favor staying this case. The court thus stays these proceedings pending resolution of the state court case. And it administratively closes this case.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' Renewed Joint Motion to Stay under the *Colorado River* Abstention Doctrine or the Claim-Splitting Doctrine (Doc. 120) is granted. The court stays the case and directs the Clerk of the Court to administratively close the case.

**IT IS SO ORDERED.**

**Dated this 18th day of November, 2024, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree      **
**Daniel D. Crabtree**
**United States District Judge**

---

[10]    Plaintiff never responded to defendants' dismissal motion but instead moved to strike defendants' motion. *See* Doc. 177. She argues that the court denied defendants' previous Motions to Dismiss, Doc. 85 and Doc. 114, and the present motion is simply a third attempt to dismiss and, therefore, redundant. Doc. 177 at 4. But that's not quite what happened.

When the Western District of Missouri transferred this case, defendants' Motion to Dismiss (Doc. 72) remained pending. *See* Doc. 114 at 2. Our court dismissed the pending motion without prejudice to refiling. *Id.* at 3. Our court reasoned that portions of Doc. 72 argued about defendants' personal jurisdiction in Missouri, an issue now moot after the transfer. *Id.* at 2. Plaintiff understands this as the court denying defendants' motion. But it wasn't. The court never reached the merits of defendants' motion. And so, the court explicitly allowed defendants to refile. For the first time here, the court reaches the merits of defendants' Motion to Dismiss. The motion is not, therefore, redundant, and not subject to strike.